257 F.2d 105
 Vincenzo COSCIA, Petitioner-Appellee,
v.
John A. WILLARD, as Deputy Commissioner of the United States Department of Labor Bureau, of Employees' Compensation, Second Compensation District, and Universal Terminal and Stevedoring Corporation and The Travelers Insurance Company, Respondents-Appellants.
 No. 318.
 Docket 24947.
 United States Court of Appeals Second Circuit.
 Argued May 2, 1958.
 Decided June 30, 1958.
 
 Philip F. Di Costanzo, Brooklyn, N. Y., Robert Klonsky, Brooklyn, N. Y., of counsel, for petitioner-appellee.
 Robert S. Green, Department of Justice, Washington D. C. (George Cochran Doub, Asst. Atty. Gen., Cornelius W. Wickersham, Jr., U. S. Atty., Brooklyn, N. Y., Samuel D. Slade, Department of Justice, Washington, D. C., on the brief), for respondent-appellant John A. Willard.
 Galli & Locker, New York City, Urban S. Mulvehill, New York City, of counsel, New York, New York, for respondents-appellants Universal Terminal and Stevedoring Corporation and Travelers Insurance Company.
 Before CLARK, Chief Judge, and HINCKS and STEWART, Circuit Judges.
 STEWART, Circuit Judge.
 
 
 1
 On September 18, 1953, Vincenzo Coscia was employed by Universal Terminal and Stevedoring Corporation as a winchman on board the steamship "African Crescent," which was then moored at Brooklyn, New York, discharging cargo. Alleging that he had sustained an injury arising out of and in the course of his employment on that day, Coscia filed a claim under the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C.A., § 901 et seq., asking compensation for permanent total disability.
 
 
 2
 After an extensive hearing the Deputy Commissioner rejected the claim in an order based upon his findings of fact. Coscia then filed an action in the district court to set aside this order. The court entered summary judgment for Coscia, holding simply that the Deputy Commissioner's order was "not in accordance with law" and remanding the case for "further proceedings in accordance with law." This appeal followed.
 
 
 3
 The only issue here is whether the Deputy Commissioner's order was supported by substantial evidence on the record considered as a whole. If so, the district court was in error in setting the order aside. O'Leary v. Brown-Pacific-Maxon, 1951, 340 U.S. 504, 508, 71 S.Ct. 470, 95 L.Ed. 483; Gooding v. Willard, 2 Cir., 1954, 209 F.2d 913, 916.
 
 
 4
 Several basic facts were established by undisputed evidence at the administrative hearing. Coscia was a longshoreman of thirty-five years experience who had suffered from impaired vision in his right eye during his entire adult life. He was on the day in question engaged in employment covered by the federal compensation statute. While he was occupied with a fellow employee in trying to lower a boom on the "African Crescent," an accident of some nature occurred, and Coscia thereafter complained that he was unable to see out of his left eye. He was examined by a physician a few minutes later, by another physician the following day, and by several other physicians during the ensuing months, and these examinations all showed that Coscia was almost totally blind in his left eye. The loss of vision was the result of a vitreous hemorrhage.
 
 
 5
 Upon two interdependent and controlling factual questions the evidence before the Deputy Commissioner was in conflict: What was the nature of the accident that befell Coscia as he was attempting with his fellow longshoreman to lower the boom? Did any injury he then sustained contribute to cause the loss of vision in his left eye?
 
 
 6
 At the hearing Coscia testified that he had been struck on the left eye by a wire cable, and that his head had been thrown back against the mast. The testimony of two eyewitnesses to the occurrence was somewhat inconclusive, but not inconsistent with Coscia's story.[1] Coscia's own eye specialist, whom Coscia had consulted some six weeks after the occurrence, testified that Coscia had given a history of being struck on the left eye. Two other physicians who had not examined Coscia until several months after the accident also testified that he had given them a similar history.
 
 
 7
 On the other hand, the safety director to whom Coscia complained immediately after the occurrence, the physician who examined him a few minutes later, the physician who saw him the following day, and one who examined him ten days later, all testified that Coscia had complained only that grease had entered his left eye, and that he had not mentioned being struck on his eye or head. None of the witnesses who observed Coscia immediately after the accident saw any evidence of trauma, such as contusion or abrasion. The physician who first examined him observed only a mild conjunctivitis in Coscia's left eye and found some particles of grease, which he removed.
 
 
 8
 As to whether there was or could have been a causal relationship between the accident of September 18, 1953, and the loss of vision in Coscia's left eye, the evidence was also in conflict. It was the specialist who examined Coscia the day after the accident who determined that the loss of vision was caused by a vitreous hemorrhage. He testified that the vitreous hemorrhage was an old one, unrelated in his opinion to the accident of the day before. He also stated that there are several possible causes of vitreous hemorrhage, including arteriosclerosis, a condition from which Coscia was apparently suffering. Other physicians who testified concurred in the opinion that there could have been no causal connection between the accident and Coscia's blindness. Upon the assumption, however, that Coscia's version of the nature of his accident was accurate, two of the medical experts testified that there was or could have been a causal relation between the accident and the loss of vision.
 
 
 9
 Upon this record the Deputy Commissioner found that while Coscia was "employed as a longshoreman for the employer herein, some grease from a wire fall entered his left eye; * * * that the claimant's loss of vision in the left eye was due to a vitreous hemorrhage which antedated the date of the alleged injury; that the entry of grease in the left eye did not aggravate said vitreous hemorrhage and caused no loss of vision; and that the claimant did not sustain accidental injury as alleged at the hearing." The order of the Deputy Commissioner rejecting the claim for compensation was based upon these findings.
 
 
 10
 One telling argument is advanced by counsel in support of the district court's judgment setting aside this order. It is pointed out that there was evidence that for many years Coscia had been "industrially blind" in his right eye, and that therefore his left eye must have been unimpaired up to the time of the accident to permit him to perform the duties of a winchman, which required him to observe hand signals from thirty or forty feet away and to see down into the hold of a ship a distance of fifty feet or more. But upon this phase of the case the evidence was also in conflict. While it was established that the vision in Coscia's right eye had long been impaired, the expert witnesses disagreed as to the extent of the impairment. Coscia himself testified on direct examination that he could see "a block and a half" with his right eye. He stated that he had had "some little trouble with vision in the right eye, but I never went to a doctor and I bathed the eye at times."
 
 
 11
 It follows that the Deputy Commissioner's findings and order were substantially supported by the record considered as a whole. It was his exclusive function to assess the credibility and reliability of the witnesses. Gooding v. Willard, 2 Cir., 1954, 209 F.2d 913; Kwasizur v. Cardillo, 3 Cir., 1949, 175 F.2d 235. It was for him alone to determine what permissible inferences to draw from the facts. Cardillo v. Liberty Mutual Insurance Co., 1947, 330 U.S. 469, 67 S.Ct. 801, 91 L.Ed. 1028; Parker v. Motor Boat Sales, 1941, 314 U.S. 244, 62 S.Ct. 221, 86 L.Ed. 184. In setting the order aside the district court, therefore, exceeded the permissible scope of judicial review. O'Leary v. Brown-Pacific-Maxon, 1951, 340 U.S. 504, 71 S.Ct. 470, 95 L.Ed. 483; Del Vecchio v. Bowers, 1935, 296 U.S. 280, 56 S.Ct. 190, 80 L.Ed. 229.
 
 
 12
 In view of the humanitarian purpose of the Longshoremen's and Harbor Workers' Compensation Act, and of Coscia's present physical condition, this conclusion has not been easily reached. But if the integrity of the administrative process is to be preserved in this case, the Deputy Commissioner's order must be upheld.
 
 
 13
 The judgment is set aside and the case remanded with directions to dismiss the complaint.
 
 
 
 Notes:
 
 
 [1]
 Testimony of Joseph Bianco:
 [Bianco] "I saw there was a great shock by the wire, by the cable, and Mr. Cascia, this guy here, was on this side. I saw he went this way. (Indicating) I couldn't see on the other side, but the cable must have hit him and he bunks against — I can't see, picture no show.
 "Q. Where did the cable hit him? In the eye? A. I was on this side. I couldn't see the face. I saw from the back. When he was working he showed me his back. I see the face of the other guy, because one was over here, and one was over here. (Indicating) He was covered from here.
 "Q. You didn't see the face, you saw the back? A. Yes.
 "Q. You saw Mr. Cascia's head go back? A. Yes.
 "Q. You are not sure whether the cable actually hit him on the face. A. I don't see that. I was coming from behind, going up with the ladder. The ladder, this side. I couldn't see the face. I could see the back only."
 Testimony of Chiro Oliviero:
 "Q. And can you tell us now exactly what happened that day while you were lowering this boom? A. While we were engaged in lowering this boom, plenty of slack, Cascia cried out, `wait a minute, I have got grease in my eye,' and at that moment the slack that was around the bit swung and struck Cascia.
 "Q. Now, did the slack that you were feeding hit him, or did something else hit him? A. The slack on the cable vibrated from side to side and striking him on the face."